

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

SA'AD EL-AMIN,

       Plaintiff,

v.                            Civil Action No. 3:12CV538

COMMONWEALTH OF VIRGINIA,

and

ROBERT F. MCDONNELL, in his Individual
Capacity and in his Official Capacity as Governor
of the Commonwealth of Virginia,

and

JANET VESTAL KELLY, in her Individual
Capacity and in her official capacity as Secretary
of the Commonwealth,

and

J. KIRK DE COURCEY SHOWALTER, in her Individual
Capacity and in her official capacity as Registrar,
City of Richmond, Virginia

       Defendants.

## COMPLAINT

COMES NOW, your Plaintiff Sa'ad El-Amin, pro se, and states the following facts and causes of action against the defendants, Commonwealth of Virginia and Robert F. McDonnell:

## PARTIES

1)      Sa'ad El-Amin ("El-Amin") is a resident of the City of Richmond, Virginia.

2)      El-Amin is a 72-year-old citizen of the United States and is of lawful voting age.

3)      In 2003, El-Amin was convicted of violation of 18 U.S.C. §371, conspiracy to attempt to evade or defeat tax.

4)     The Commonwealth of Virginia ("the State") is one of the original states of the United States of America that operates under a constitution that was last adopted on August 1, 1851.

5)     Robert F. McDonnell ("McDonnell") is the 71st Governor of the Commonwealth of Virginia and sworn into this office in January 2010.

6)     Defendant, Janet Vestal Kelly ("Kelly"), is the duly appointed Secretary of the Commonwealth, who office is charged with all administrative duties pertaining to restoration of voting rights in the Commonwealth.

7)     J. Kirk De Courcey Showalter ("Showalter") is the duly appointed Registrar of the City of Richmond.

## JURISDICTION AND VENUE

8)     El-Amin bring this civil rights action pursuant to 28 U.S.C. § 1331, 2201 and 2202; 42 U.S.C. §§ 1973, et. seq., 1983 and 1988; and, the 8th, 14th, and 15th Amendments to the Constitution of the United States.

9)     The seat of the Government of the Commonwealth of Virginia and the Governor reside within the venue jurisdiction of this Court, to wit, the City of Richmond.

## FACTS

### A.     Sa'ad El-Amin

10)     On or about July 1, 2003, El-Amin entered a guilty plea in this Court to violating 18 U.S.C. §371, conspiracy to attempt to evade or defeat tax.

11)     On or about October 17, 2003, the Court sentenced El-Amin to 37 months in federal prison and ordered that following his release from prison that El-Amin would be on supervised release for a term of three years.

2

12)     El-Amin was released from prison on May 10, 2006 and completed his Halfway House commitment on August 8, 2006.

13)     El-Amin also completed his supervised release on August 8, 2009.

14)     At the time that El-Amin entered his guilty plea, he was a registered voter in the City of Richmond and was serving a term as an elected member of Richmond City Council, representing the Sixth District.

15)     Immediately following his guilty plea, El-Amin tendered his resignation from the Richmond City Council.

16)     Sometime after entering his guilty plea, El-Amin was notified by Showalter that his name had been stricken from the rolls of qualified voters for the City of Richmond because of his status as a convicted felon.

17)     El-Amin's felony conviction has resulted in his being barred from voting and holding public office in Virginia for the rest of his life.

**B.     The Schema of Felony Disenfranchisement in Virginia**

18)     There are approximately 378,000 citizens in Virginia who are barred from exercising their right to vote due to a felony conviction.

19)     The criteria for one to apply to McDonnell to have his or her voting rights restored is as follows:

        a)      Must be a resident of Virginia, and/or have been convicted of a felony in a Virginia court, a U.S. District court or a military court;

        b)      Be free from any sentence served or supervised probation and parole for a minimum of two years for a non-violent offense or five years for a violent felony or drug distribution, drug manufacturing offense, any crimes against a minor, or an election law offense;

3

c)      Have paid all court costs, fines, penalties and restitution and have no felony or misdemeanor charges pending; and

d)      Not have had a DWI in the five years immediately preceding the application;

e)      Not have any misdemeanor convictions and/or pending criminal charges 2 years preceding the application for non-violent felonies or five years for a violent felony.

20)      Defendant, Janet Vestal Kelly, the Secretary of the Commonwealth published a web site, Criteria for Restoration of Rights , in which she sets forth an inclusive list of the felony offenses requiring the completion of either a two or five year application for rights restoration.

21)      The felony convictions requiring the completion of a two (2) year application are listed as follows:

a)      embezzlement, welfare fraud, habitual offender, grand larceny, drug possession, excluding with the intent to distribute;  breaking and entering; burglary/statutory. burglary/possession of burglarious tools; obtain money by false pretenses; prescription fraud/obtain drugs by fraud; petit larceny; 3rd or subsequent offense; felonious shoplifting/concealment/price altering;  driving under the influence or driving while intoxicated; 3rd or subsequent offense; credit card theft/credit card fraud/credit card forgery; identity theft; mail theft/mail fraud; bank fraud; issuing bad checks/worthless checks; felony eluding police; forgery; uttering;  perjury; false statement on firearm transaction record; and unlawful possession of a concealed weapon.

22)      The felony convictions requiring the completion of a five (5) year application are listed as follows:

a)      drug possession with the intent to distribute; drug distribution; drug manufacturing; robbery; malicious/unlawful wounding; felonious assault; maiming; murder; manslaughter – involuntary or voluntary; production, publication; sale, financing, ; etc. of child pornography; shooting into an occupied vehicle or building; arson of an occupied vehicle or building;    hit &

4

run/leaving the scene of an accident with injury; election fraud; rape; forcible sodomy/sodomy of a minor; carnal knowledge of a minor; carnal knowledge of an inmate by correctional or law enforcement officer; breaking and entering with intent to commit rape or assault; accommodation sale of a controlled substance; and child abuse/neglect.

23)     McDonnell has total and complete discretion as to whether or not he approves the applicant and restores his/her voting rights.

24)     McDonnell has not published nor made public any specific criteria that he uses in deciding on the applications for restoration of rights.

25)     The following statement is set forth in the application for reinstatement:

> **The Governor has the sole discretion to restore a person's  civil rights under the Virginia Constitution. There is no process for appealing his decision.** A person who has been denied may reapply after one year. The goal of the Administration is to have all decisions made within 60 days of the receipt of a complete and eligible application, with written notice given to the applicant."

(Emphasis Added)

26)     Unless and until McDonnell restores El-Amin's voting rights, he will remain disenfranchised in the Commonwealth of Virginia for the rest of his life.

## C.     Virginia's History of Voter Disenfranchisement

27)     Article II, Section 1 of the Virginia Constitution states as follows:

> No person who has been convicted of a felony shall be qualified to vote unless his civil rights have been restored by the Governor or other appropriate authority.

28)     Article II, Section 1 survived revisions to the Virginia Constitution in 1851, 1870, and 1902.

29)     In 1861, after Virginia voted for secession, western and several northern Virginia counties dissented and created a separate state, West Virginia with its own Governor.

5

30)     A new Constitution was enacted in 1864 which abolished slavery in Virginia, disfranchised any representatives who served in the Confederate government and adjusted the number and terms of office of the members of the Virginia Assembly.

31)     Subsequent Virginia Constitutions do not include the 1864 Constitution in its list of previous constitutions, because the 1864 Constitution was drafted under wartime conditions and was deemed by those who seceded as having little or no legal significance.

32)     The above provision was contained in the Constitution of Virginia when it was enacted in 1830.

33)     From the time of the original enactment the Constitution of Virginia until present, the only persons who were disenfranchised were those persons convicted of a felony.

**D.     Virginia's Secession from the United States**

34)     Virginia was one of 11 states to secede from the United States of America and did so on April 17, 1861.

35)     Following its secession, Virginia joined the Confederate States of America waged war against the United States.

36)     Virginia's war against the United States of America included offense of action in which the Confederate Army made incursions into Northern states including Pennsylvania.

37)     Virginia's act of secession and taking up arms against the United States violated Article III, Section 3, of the United States Constitution, which makes it illegal for any person to levy war against the United States or gives Aid and Comfort to those who do so.

38)     Such acts are deemed treason within the meaning of the United States Constitution.

39)     Treason is a felony offense as evidenced by the fact that on June 13, 1866, Jefferson Davis, the former president of the Confederate States of America,  was indicted for treason.

6

40)   The indictment against Davis was eventually dismissed in 1869 following the granting of

general amnesty by President Andrew Johnson to those who seceded from the United States.

E.   §§ 1, 2 and 3 of the 14th Amendment

41)   On July 9, 1868, the 14th Amendment, one of the so-called "Reconstruction Amendments",

was ratified.

42)   On July 28, 1868, the Secretary of State issued a proclamation certifying the ratification of

the 14th Amendment by the states.

43)   § 1 of this Amendment states as follows:

> All persons born or naturalized in the United States, and subject to the
> jurisdiction thereof, are citizens of the United States and of the state
> wherein they reside. **No state shall make or enforce any law which
> shall abridge the privileges or immunities of citizens of the United
> States; nor shall any state deprive any person of life, liberty, or
> property, without due process of law; nor deny to any person
> within its jurisdiction the equal protection of the laws.**

(Emphasis Added)

44)   § 2 states as follows:

> Representatives shall be apportioned among the several states
> according to their respective numbers, counting the whole number of
> persons in each state, excluding Indians not taxed. But when the right
> to vote at any election for the choice of electors for President and Vice
> President of the United States, Representatives in Congress, the
> executive and judicial officers of a state, or the members of the
> legislature thereof, is denied to any of the male inhabitants of such
> state, being twenty-one years of age, and citizens of the United States,
> or in any way abridged, **except for participation in rebellion, or
> other crime,** the basis of representation therein shall be reduced in the
> proportion which the number of such male citizens shall bear to the
> whole number of male citizens twenty-one years of age in such state.

(Emphasis Added)

45)   § 3 states as follows:

> No person shall be a Senator or Representative in Congress, or elector
> of President and Vice President, or hold any office, civil or military,

under the United States, or under any state, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any state legislature, or as an executive or judicial officer of any state, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But Congress may by a vote of two-thirds of each House, remove such disability.

46)    The relevant portion of § 1 as it pertains to this action, prevents or prohibits Virginia or any

other state to deny a citizen his or her rights to due process of law and equal protection of the laws.

47)    The relevant portion of § 2 as it pertains to this action is the right of Virginia or any other

state to; exclude or disenfranchise from the right to vote those persons who participated in rebellion

or "other crime (s)".

48)    The relevant portion of § 3 as it pertains to this action specifically prohibited one to hold

public office if they had engaged in insurrection or rebellion or given aid or comfort to the enemies

of the United States.

49)    From December 1867 to April 1868, a new constitutional convention meet in Richmond in

response to federal Reconstruction legislation. A large contingent of conservative whites boycotted

the convention because of the § 2 mandate in the 14th Amendment which prohibited states from

barring Black males from voting.

50)    Due to the white boycott, so-called "Radical Republicans", led by Judge John Underwood,

dominated the convention. This resulted in the crafting of what became known as the "Underwood

Constitution", which white opponents dubbed the "Negro Constitution".

51)    The Underwood Constitution included a provision disfranchising former Confederate

government members that proved to be a stumbling block to the adoption of the Constitution

because of white conservative opposition.

52)   After much wrangling, a compromise was reached where it was agreed that the disfranchisement clauses would be decoupled from the rest of the constitution and that separate votes would be taken on the decoupled provisions.

53)   Following votes on the provisions, the disfranchisement clauses were defeated while the rest of the Constitution won approval and became the 1870 revision.

54)   The removal of the disfranchisement clauses from the 1870 Virginia Constitution occurred more than two years before the passage of the Amnesty Act of May 22, 1872, which removed voting restrictions and office-holding disqualification against most of those who rebelled in the American Civil War.

55)   Despite the clearly disqualifying language in §§ 2 and 3 of the 14th Amendment, with regard to those who participated in the rebellion, and prior to the Amnesty Act, Virginia only disqualified from voting those convicted of a felony.

56)   In Virginia, Blacks comprise a majority of those convicted of a felony; while an overwhelming majority of those who participated in rebellion were White.

**F.   Virginia's Suppression of the Black Vote Post Reconstruction**

57)   The 15th Amendment to the Constitution which was ratified on February 3, 1870, granted African American men the right to vote by declaring that the "right of citizens of the United States to vote shall not be denied or abridged by the United States or by any state on account of race, color, or previous condition of servitude."

58)   In response to the 15th Amendment, the Virginia Legislature employed various and sundry devices specifically intended to deprive black men of the opportunity to vote, including, but not limited to literacy tests, grandfather clauses, poll taxes, and other combinations of election law changes.

59)     In the Virginia Constitution of 1902, Article II, §§18 and 19 allowed every male citizen aged

twenty-one or older the right to register and vote who had either served or was the son of any man

who (1) had served in the army or navy of the United States or of the Confederate States; (2) who

paid at least one dollar in property tax; and (3) who could read and explain, or explain having heard

read, any section of the constitution.

60)     The Virginia General Assembly enacted in 1904 a law that restricted the right to vote only to

men who, (1) had paid a poll tax of $1.50 for each of the three preceding years (exempting Civil

War veterans); (2) who made application to the registrar unassisted and in their own handwriting;

and, (3) who provided satisfactory answers to any questions that the registrar asked.

61)     Carter Glass, who was elected to the Senate of Virginia in 1899, and was a delegate to the

Virginia constitutional convention of 1901–1902, was a principal in the drafting and passage of the

Article II.

62)     Glass stated without equivocation that Article II would not automatically deprive white men

of the ballot, but was intended to drastically reduce the Black vote, estimating a four-fifths reduction

in the Black vote, which he declared was the purpose of this Convention.

63)     Glass' statements and pronouncements were neither repudiated, corrected nor amended by

the executive, legislative or judicial branches of the Commonwealth of Virginia.

64)     In addition to constitutional and legislative enactments, white citizens of Virginia utilized

various and sundry forms of intimidation and violence to suppress the Black vote.

65)     It was not until the passage of the Voting Rights Act in 1965 and the subsequent supervision

of its protections by the United States Department of Justice that many of the acts of suppression of

the Black vote were either eliminated or neutralized in Virginia.

### G.     Causes of Action

### Count I

**(Disenfranchisement in Virginia is a Denial of Equal Protection)**

66)     El-Amin restates and realleges the foregoing paragraphs and incorporate them by reference in this Count of the Complaint and states as follows:

67)     El-Amin contends that his right to vote is pursuant to the 15th Amendment to the United States Constitution.[1]

68)     African-Americans make up more than 50% of the state's disenfranchised population, despite being only 20% of the total population.

69)     While § 2 of the 14th Amendment provided for two classes of persons who could be denied the right to vote, to wit those who participated in rebellion and those convicted of crime, Virginia only disenfranchised convicted felons.

70)     The majority of convicted felons were persons of African descent.

71)     In contrast, virtually all of the persons who participated in the rebellion that encompassed the Civil War were White.

72)     The net effect was that while a majority of the persons who should have been disenfranchised in Virginia was white, the majority who were actually disenfranchised were Black, a result that was fully intended by Virginia's General Assembly.

73)     The disproportionate disenfranchising of Black males with regard to §2 was further exacerbated by the activities of the Commonwealth of Virginia following the passage of the 15th Amendment to the Constitution of the United States as set forth in ¶61, above in suppressing the Black male vote.

---

[1] "§1. The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.
§ 2. The Congress shall have power to enforce this article by appropriate legislation."

74)    These efforts and intended consequences establish the necessary racial animus that disenfranchisement of the Black male vote in Virginia was intentional and done under the color of state law.

75)    Moreover, since disenfranchisement of felons is allegedly intended to punish criminal conduct, the following persons who engaged in criminal conduct escaped disenfranchisement which is a denial of equal protection:

    a)    Individuals granted immunity from prosecution by federal and state prosecutors in order to gain their testimony or other cooperation in a criminal matter.

    b)    Individuals identified as an "unindicted co-conspirators" in federal and state indictments but who are not prosecuted.

    c)    Individuals who based on a favorable plea agreement are charged with a misdemeanor rather than a felony offense despite that their conduct constitutes a felony offense.

76)    Each of the above individuals identified in the preceding paragraphs managed to avoid prosecution and conviction of a felony by virtue of prosecutorial largess.

77)    Virginia's refusal to disenfranchise former Confederates and prosecutorial largess, which were or are done under the color of state law, violates El-Amin's equal protection rights.

<b>Count II</b>

<b>(Reinstatement Violates Substantive and Procedural Due Process)</b>

78)    El-Amin restates and realleges the foregoing paragraphs and incorporate them by reference in this Count of the Complaint and states as follows:

79)    The complete absence of rules, standards, or procedures, except the requirement to make a written application for the restoration of rights is a denial of El-Amin's substantive and procedural rights to due process.

12

80)     El-Amin has a fundamental right to vote and hold office in Virginia, which requires that any restoration schema include substantive and procedural due process.

81)     The only way to the restoration of voting rights in Virginia other than a pardon is through a two or five year written application as previously mentioned.

82)     McDonnell is not authorized to issue a pardon to El-Amin because his offense was federal not state.

83)     The fact that El-Amin's felony conviction is not included as one of the offenses requiring either a two or five-year application makes him ineligible for reinstatement of his rights in Virginia.

84)     This ineligibility denies El-Amin his substantive due process rights.

85)     The fact that McDonnell has total and complete discretion as to whether or not he approves the applicant and restores his/her voting rights; that McDonnell has not published nor made public any specific criteria that he uses in deciding on the applications for restoration of rights; and that there is no process for appealing McDonnell's decision denies El-Amin's procedural due process rights.  See § 53.1-231.2 of the Code of Virginia,

## Count III

### (Reinstatement in Virginia is Capricious and Arbitrary)

86)     El-Amin restates and realleges the foregoing paragraphs and incorporates them by reference in this Count of the Complaint and states as follows:

87)     For the reasons and facts set forth in Count II, above, the schema for the reinstatement of schema of El-Amin's voting rights violates the 14th Amendment because it is capricious and arbitrary.

## Count IV

### (Disenfranchisement in Virginia, a Violation of the 8th Amendment)

13

88)     El-Amin restates and realleges the foregoing paragraphs and incorporate them by reference in this Count of the Complaint and states as follows:

89)     The 8th Amendment states, "Excessive bail shall not be required, nor excessive fines imposed, **nor cruel and unusual punishments inflicted.**" (Emphasis Added)

90)     In determining what constitutes cruel and unusual punishment, the Supreme Court in *Trop v. Dulles*, 356 U.S. 86, 99, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) observed, that "because words of the Amendment are not precise, and that their scope is not static, the [Eighth] Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." 356 U.S. at 101.

91)     In 1850 more than one-third of states disenfranchised ex-felons. This number dramatically increased so that almost three-fourths of states disenfranchised ex-felons by 1920.

92)     However, from 1960 states abolished these restrictions and restored voting rights to some or all ex-felons. (Exhibit 1)

93)     Over the years, the Virginia General Assembly has turned a blind eye and deaf ear to the national trend of restoring voting rights to ex-felons. This is evidenced by the fact that the spite recent polls showing broad public support for Virginia to join this national trend, each legislative year where bills are patroned for the restoration of voting rights, these bills are routinely tabled and have yet to get even out of the appropriate committees to be voted on.

94)     There is clearly no political will in the General Assembly to pass legislation restoring the voting rights of exfelons.

95) In the most recent legislative session, a bill patroned by the late Senator Yvonne B. Miller[2]

(D) - Senate District 5, 2012, SJ 35, was a Constitutional amendment seeking restoration of civil

rights to persons convicted of nonviolent felonies, which reads:

> Constitutional amendment (first resolution); restoration of civil rights.
> Authorizes the General Assembly to provide by law for the restoration
> of civil rights for persons convicted of nonviolent felonies who have
> completed service of their sentences subject to the conditions,
> requirements, and definitions set forth in that law. The present
> Constitution provides for restoration of rights by the Governor. The
> amendment retains the right of the Governor to restore civil rights and
> adds the alternative for restoration of rights pursuant to law.

96) This proposed legislation was referred to the Senate Committee on Privileges and Elections

that continued it to the same committee during the 2013 legislative session.

97) The same fate occurred to similar bills in prior legislative years.

98) For these reasons, the continued disenfranchisement of El-Amin violates his 8th Amendment

rights.

## H. PRAYER FOR RELIEF

**WHEREFORE**, El-Amin respectfully requests that the following relief be granted:

a) That this Court issue a declaratory judgment that Virginia's history of

suppressing the black vote establishes by a preponderance of evidence racial discrimination

which was a substantial and motivating factor in the adoption of the 1870 and subsequent

revisions of Virginia's constitution which included disenfranchisement of the right to vote for

felons.

b) That this Court issue a declaratory judgment that the disenfranchisement of

El-Amin's right to vote in Virginia is a denial of his Equal Protection rights.

---

[2] Senator Miller died on July 3, 2012. She was the first black woman elected to the House of Delegates and state
Senate, where she later became the first to chair a standing committee. Senator Miller was a long time advocate for
restoration of the voting rights of exfelons.

c)  That this Court issue a declaratory judgment that the disenfranchisement of El-Amin's right to vote in Virginia is a violation of the 8th Amendment's evolving standards of decency.

d)  That this Court issue a declaratory judgment that Virginia's schema for reinstatement of El-Amin's voting rights violate his substantive and procedural due process rights.

e)  That this Court issue a declaratory judgment that Virginia's schema for reinstatement of El-Amin's voting rights the disenfranchisement of El-Amin's right to vote in Virginia is capricious and arbitrary.

f)  That this Court issue a temporary and permanent injunction enjoining Defendants and their agents, employees, and representatives from denying El-Amin the right to register to vote.

g)  That this Court issue a temporary and permanent injunction to require Defendant Showalter to recognize that El-Amin is eligible to register to vote, and that he is not required to apply for or obtain reinstatement of his voting rights prior to registering to vote.

h)  El-Amin further requests the award of reasonable attorneys' fees, expenses, and costs under 42 U.S.C. §§ 1973l(e) and 1988.

i)  El-Amin requests such other, further, and different relief as the facts and circumstances may warrant.

Respectfully submitted,

SA'AD EL-AMIN

Sa'ad El-Amin
Digitally signed by Sa'ad El-Amin
DN: cn=Sa'ad El-Amin, o, ou,
email=saadelamin@aol.com, c=US
Date: 2012.07.24 12:53:35 -04'00'

16

Sa'ad El-Amin, pro se
24 Overbrook Road
Richmond, VA 23222
804-439-8515