RECEIVED

2012 SEP 17  P 4: 10

CLERK US DISTRICT COURT
RICHMOND, VIRGINIA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

**SA'AD EL-AMIN**

**Plaintiff,**

**v.**                                      **Case No. 3:12CV538**

**COMMONWEALTH OF VIRGINIA, et al.,**

**Defendants.**

## MEMORANDUM OPPOSITION TO COMMONWEALTH
## OF VIRGINIA, GOVERNOR McDONNELL AND SECRETARY
## OF THE COMMMONWEALTH KELLY'S MOTION TO DISMISS[1]

**COMES NOW**, the Plaintiff, Sa'ad El-Amin, pro se, who files his Memorandum in

Opposition to a Motion to Dismiss filed by Defendants the Commonwealth of Virginia, Robert

F. McDonnell, Governor of the Commonwealth of Virginia, and Janet Vestal Kelly, Secretary of

the Commonwealth of Virginia and in furtherance of said motion, state as follows:

1.    **The Claims Of Misconduct Set Forth In The Complaint Are Sufficient To Survive
      Defendant's' Motion To Dismiss And Support The Attached Motion For Summary
      Judgment.**

     Defendants' argue that this Court does not have subject matter jurisdiction because the

complaint fails to sets forth a plausible claim for relief which is more than the mere possibility of

misconduct. Defendants' Memorandum, p. 21.

     The complaint sets forth in great detail the actions taken during the 1867-68

Constitutional Convention which crafted the 1870 revision.   One of the most important issues

before the Convention was to retain the right to vote to former confederate white men following

---

[1] Since Defendants contend that the Court does not have subject matter jurisdiction over this case, and consistent
with Defendants' supporting their motion to dismiss with documents outside of the Complaint, El-Amin will
likewise include documents outside of the Complaint to support his opposition to the motion to dismiss.  However,
in an abudance of caution, El-Amin includes in his opposition a statement of facts he contends are not in dispute to
comply with the Local Rule regarding summary judgments.

the Civil War[2] in the face of clear and unequivocal instructions by Congress to disenfranchise the voting rights of these men pursuant to §§ 2 and 3 of the 14th Amendment.

In the end, this goal was successful. It was accomplished with an animus and motivation that was patently racist and mean-spirited given the intent to dilute and offset the newly given right to vote to Black men.

## 2.   The Section 1983 Claims Set Forth In Counts I-IV Are Not Barred By The 11th Amendment.

Defendants argue, "[t]he § 1983 Claims in Counts I, II, III, and IV, against the Commonwealth of Virginia, are barred by the Eleventh Amendment." Id. at p. 13. When the history of the 1870 Constitution is factored in, the 11th amendment is not a bar because Virginia was not a "state" at the time the 1870 amendment to its constitution was passed. The reason is simple and straightforward. Virginia gave up its status as a state when it seceded from the Union and took up arms against the United States. Because Virginia was not a state, it cannot claim sovereign immunity.

Second, it is well-settled law that Congress may abrogate the States' sovereign immunity if it has "unequivocally expresse[d] its intent to abrogate the immunity" and has acted "pursuant to a valid exercise of power." *Green v. Mansour*, 474 U.S. 64, 68, 106 S.Ct. 423, 425-426, 88 L.Ed.2d 371.

It is also well settled that Congress has the power to abrogate the Eleventh Amendment in accordance with its power under § 5 of the Fourteenth Amendment. *Seminole Tribe v. Florida*, 517 U.S. 44, 56-59,116 S. Ct. 1114 (1996).

---

[2] It is the general consensus that The Civil War was America's bloodiest conflict resulting in nearly 1,100,000 casualties and claimed more than 620,000 lives. (Exhibit 7)

2

Ordinarily, allegations of violations of the Fourteenth Amendment are not sufficient to clear the 11th Amendment bar. Rather, a plaintiff  must bring his/her  claims pursuant to a federal statute that specifically abrogates a state's Eleventh Amendment immunity.

This is one of the rare cases in which it is clear that the Congress of the United States abrogated the immunity of Virginia because it required that all states that seceded from the Union that wanted to rejoin the Union were required to submit a new constitution with specific disenfranchisement language, persons involved in criminal activity and those who rebelled against the Union.

The Court in *Ramirez v. California*, 418 U.S. 24 (1974)  specially discussed the readmission process in its decision when it observed:

> Section 5 of the Reconstruction Act established conditions on which the former Confederate States would be readmitted to representation in Congress. It provided: That when the people of any one of said rebel States shall have formed a constitution of government in conformity with the Constitution of the United States in all respects, framed by a convention of delegates elected by the male citizens of said State, twenty-one years old and upward, of whatever race, color, or previous condition, who have been resident in said State for one year previous to the day of such election, except such as may be disfranchised for participation in the rebellion or for felony at common law, and when such constitution shall provide that the elective franchise shall be enjoyed by all such persons as have the qualifications herein stated for electors of delegates, and when such constitution shall be ratified by a majority of the persons voting on the question of ratification who are qualified as electors for delegates, and when such constitution shall have been submitted to Congress for examination and approval, and Congress shall have approved the same, and when said State, by a vote of its legislature elected under said constitution, shall have adopted the amendment to the Constitution of the United States, proposed by the Thirty-ninth Congress, and known as article fourteen, and when said article shall have become a part of the Constitution.

3

418 U. S. at. 49

The Constitution of Virginia submitted as a condition of readmission, failed to include the disenfranchisement of those who rebelled and the "test-oath". This was due primarily to the efforts of a special delegation from Virginia made up of nine white men, the "Committee of Nine", who traveled to Washington convinced the Reconstruction Committee in the United States Congress and President Ulysses S Grant to separate the disenfranchising clauses from the rest of the Constitution for submission to Virginia voters. This decoupling  allowed for the Constitution absent the disenfranchising clauses to be submitted and thereafter approved by the voters. The disenfranchising clauses were submitted separately and were rejected by the voters.[3]

The second and related reason is that the acceptance of this flawed document by the Congress and the approval of the Commonwealth of Virginia to rejoin the Union, which occurred on January 26, 1870, was not based upon compliance with the mandate but was done under a general compromise spirit that Southern states had suffered enough and there was a desire to that bygones be bygones in an effort to heal the Union.

Evidence of this is established by the fact that the federal indictment against former President of the Confederacy Jefferson Davis was dismissed not because he was not guilty of the crime set forth in the indictment it because of this general feeling of amnesty and to avoid the growing martyrdom of Davis among his Southern constituencies.[4]

---

[3] See "The Restoration of Virginia", John Hopkins University Studies, The Political History of Virginia During the Reconstruction, by Hamilton Jones Eckenrode (1901),  Chapter VII, pp. 111-115, 121, 125. (Exhibit 5)

[4] The government never provided an explanation for the dismissal of its indictment against Davis. The following excerpt however gives credence to the martyrdom explanation above: "The interest taken in him during his imprisonment, and their prudent idea that he was to suffer as a representative of the south, rather than for sins of his own, and was "a nation's prisoner," had made him more popular there than he had been since the first clays of the war. After an enthusiastic reception at Richmond he went to New York, then to Canada, and in the summer of 1868 visited England, a Liverpool firm having offered to take him as a partner, without capital. This offer, after

This historical background provides the rare exception to the 11th amendment bar raised by the defendants in this matter.

**3.      Given The Peculiar Circumstances Of This Case, Virginia Is A "Person" And Therefore Can Be Sued Under Counts I-IV.**

Defendants also contend that  Virginia is not a "person" and therefore cannot be sued in "Counts I, II, III and IV" under a claim made pursuant to 42 U.S.C. § 1983.  Plaintiff reiterates his above argument that since Virginia was not a "state" it cannot seek refuge under the "person" limitations of §1983.

**4.      The Governor And Secretary Of State Are Proper Parties.**

The defendants' argument that the "Governor and Secretary are not Proper Parties", falls under its own weight given the concession by defendants that under the doctrine set forth in *Ex Parte Young*, 209 U.S. 123 (1908), injunctive relief is appropriate against a state officer in his/her official capacity where  "the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." Citations omitted.

Defendants seem to ignore the facts alleged in the complaint in ¶25, to wit, "The Governor has the sole discretion to restore a person's civil rights under the Virginia Constitution...[and] [t]here is no process for appealing his decision." Defendants concede the accuracy of this allegation in their motion to dismiss.[5]

---

investigation, was declined, and, having visited France, he returned to this country. He was never brought to trial, a nolle prosequi being entered by the government in his case December, 1868, and he was also included in the general amnesty of that month. After his discharge he became president of a life insurance company at Memphis, Tenn." http://virtualology.com/uscivilwarhall/Jefferson-Davis.org/

[5]"Here, the very structure of the procedures which El-Amin challenges, provides the contours of his rights. Those procedures provide that the Governor has absolute discretion in determining whether to grant an application for restoration. Neither the Virginia Constitution, nor the Code a/Virginia, nor the Secretary's web page sets conditions on the type, number, or specificity of the criteria the Governor will utilize in considering an application. The decision whether to approve the restoration of a felon's voting rights is also envisioned as permitting no right of

While it is true that the Governor did not specifically act to revoke the voting rights of El-Amin, this having occurred by the operation of the unconstitutional provision in the Virginia Constitution, the Governor has the exclusive power to restore those rights. As such, and contrary to the argument set forth by the defendants in their motion to dismiss, the Governor has "the requisite relation to these matters necessary to be a proper party in this matter."

Rather than decreeing through his executive power the automatic restoration of voting rights of ex-felons, the Governor has chosen a lengthy and unsure process for the restoration of these rights. His process is a ponderous and restrictive process as evidenced by the glacial progress of restoring the voting rights those persons who were disenfranchised.[67]

El-Amin also argues that the Secretary the Commonwealth is also a proper party in light of the allegations set forth in the Complaint that this office " is charged with all administrative duties pertaining to restoration of voting rights in the Commonwealth." Complaint, ¶ 6

## 5. The Revocation Of El-Amin's Right To Vote Is A Violation Of His Right To Equal Protection.

Defendants contend that the revocation of El-Amin's right to vote as alleged in Count I is not a violation of Equal Protection. Defendants concede that § 1 of the Fourteenth Amendment establishes the right to equal protection, which El-Amin points to as creating his constitutional right in Count 1.

---

review by a court. To the extent that El-Amin seeks restoration of his rights, this procedure is what is due and nothing more is constitutionally required." Defendants' Memorandum, p. 30.
[6] See a more expanded discussion of this process under the Capricious and Arbitrary argument set forth in § 14, infra.
[7] An estimated 375,000 people cannot vote in Virginia because they have felony convictions. Recent governors, including McDonnell, have increased the pace of restoring voting rights for individuals, but they still issue only about 1,000 restorations a year. http://www.restoreourvote.org/BriefingPaper.pdf

The exclusion of felons from the vote is found in § 2 of the Fourteenth Amendment. It is both important and critical to this case that the Congress clearly and unequivocally intended for the disenfranchisement of former confederates as expressed in §2, and described in that section as persons who participated "in rebellion ". El-Amin contends that former confederates were similarly situated to felons in §2, and therefore former confederates serve as comparators for purposes of his equal protection claim.

Contrary to defendants' assertion, *Richardson v. Ramirez, supra*, is not applicable to the instant case. The *Ramirez* Court, held that because §2 of the 14th Amendment allowed states to lawfully include in their constitutions the disqualification of persons convicted of felonies or infamous crimes, and those who participated in rebellion from voting.

The reason that *Ramirez* is not applicable is found in the history of California's adoption of felon disqualification which is far different than Virginia's history. The critical difference is that California did not have to submit its constitution, as a condition precedent to readmission as a state. In fact, California did not become a state until 1850, and did not secede from the Union after achieving it statehood..

In addition, California's racial history with regard to African-Americans is not comparable to Virginia's horrific and inhumane treatment of Blacks. Unlike Virginia, California did not in the words of the *Hunter* Court, "discriminate against blacks on account of race...[which] continues to this day to have that effect." This difference and distinction are critical and result in the inapplicability of Ramirez to the instant case.

The same argument holds true for all of the cases cited by defendants in support of their motion to dismiss with regard to the equal protection claim. In fact, the claims made by El-Amin

7

are grounded on facts and circumstances which have never been decided by a court of law, either federal or state and therefore this is a case of first impression.

**6.     El-Amin Factual Recitations Of  Discriminatory Effect Meet The Iqbal And Twombly Test.**

In *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing*, 674 F.3d 369 (4th Cir., 2012), a defamation case,  the Court found that allegations in the complaint that the statements made were known to be false at the time they were made; were malicious or were made with reckless disregard as to their veracity were entirely insufficient because they were a "mere recitation of the legal standard... the kind of conclusory allegation... that Twombly and Iqbal rejected." 674 F.3d at 677.

On the contrary, El-Amin's facts supporting his claim of discriminatory effect were specific, detailed and given sufficient attribution that the discriminatory effect is reasonably inferred from the facts recited. It is interesting to note that defendants did not challenge her inferences drawn from these facts as being unreasonable, attenuated, or implausible.

The Complaint alleges facts sufficient to state all the elements of El-Amin's claim.  As the Court held in Blue Rhino Global Sourcing, Inc. v. Well Traveled Imports, Inc. (M.D.N.C., 2012) "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Memorandum Opinion, p. 4.

Defendants argue that the "[c]omplaint reveals that it is a hodge-podge of legal conclusions masquerading as facts and unreasonable inferences that cannot pass muster under Iqbal and Twombly." Defs Mem. p.22.

They also argue that " El-Amin's assertion that the disenfranchisement of felons provision found in Article II, § I [of Virginia's Constitution] , was enacted with a discriminatory intent is merely a legal conclusion that he draws from his vision of the historical record." Id.

A brief review of ¶¶ 49-56 in the Complaint counter this argument.  In those paragraphs, El-Amin pleads historically accurate facts which the Court must deem true for the purposes of the motion to dismiss. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Evans v. Napolitano*, No. 11-1107 (4th Cir., 2012)(Unpublished).

The Complaint alleges the following:  that  the constitutional convention convened 1867 and 1868 was boycotted by conservative whites because § 2 in the 14th Amendment prohibited states from barring Black males from voting which allowed "Radical Republicans" to dominate the convention which   whites dubbed the "Negro Constitution", Compl. ¶50; a provision disfranchising former Confederate government members proved to be a stumbling block to the adoption of the Constitution because of white conservative opposition resulting in a decoupling of the disenfranchisement provisions from the rest of the constitution and required separate votes, Compl. ¶51; the decoupled constitution passed and only the disenfranchisement of felons made it into the 1870 revision while the disenfranchisement of confederates was not included, despite the clearly disqualifying language in §§ 2 and 3 of the 14th Amendment, with regard to those who participated in the rebellion; Compl. ¶¶ 52-53; and a majority of those convicted of a felony were Black while an overwhelming majority of those who participated in rebellion were white. Compl. ¶56.

These allegations which once again must be accepted as true for purposes of the motion to dismiss.  As such, they are sufficient for this Court to infer that the exclusion of the

disenfranchisement of confederates in 1870 constitution was racially motivated and that such an inference is both reasonable and plausible.

A review of Document Number XXXVII, Minority Report of the Committee on the Elective Franchise and Qualifications for Office, which was submitted by members of the Constitutional Convention and which clearly shows the racist intent in the exclusion of the disenfranchisement of the Confederate vote. (Exhibit 1) This document counters defendants' argument that "[t]his cause and effect theory does not qualify as a valid allegation of fact. One result does not necessarily flow from the other...Such a conclusion is simply unsupportable on the facts alleged, and requires a quantum leap of faith, far greater than permitted by *Iqbal* and *Twombly*." Defs. Mem. p. 25.

7. **El-Amin's Complaint Alleges Sufficient Facts To Establish Discriminatory Intent As Well As Disparate Effect, Thus Satisfying *Irby V. Virginia State Bd. Of Elections*, 889 F.2d 1352 (4th Cir. 1989)**

Defendants clearly ignore the basic pleading requirements of a complaint which only needs to give fair notice of what the claim is and the grounds upon which it rests. Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam) and Coleman v. Maryland Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010). See also Fed. R. Civ. P. 8(a)(2) which requires that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to"

The arguments of the defendants with regard to the sufficiency of the complaint would more appropriately be the subject of a motion for summary judgment rather than a motion to dismiss.[8]

---

[8] As set forth in this Memorandum, El-Amin has also filed simultaneously with his opposition to the Motion to Dismiss, a Motion for Summary Judgment based on his assertion that there is no dispute with genuine or material facts allowing for disposition by summary judgment.

This is evidenced by the failure of the defendants to recognize the limited function of a motion to dismiss by the fact that they take issue with the facts recited in the complaint; or El-Amin's interpretation of history; or, whether conclusion that El-Amin's draws from the facts cited are correct or accurate.

The defendants in their memorandum made an important observation with regard to the Constitution of 1870, observing that it " expanded those disabilities yet again, to include a list of specific offenses including election bribery, embezzlement of public funds, and treason." Id. at 23

With regard to El-Amin's Equal Protection claim, the fact is that most, if not all of those who fought against the Union were white males and were therefore candidates for prosecution for treason. Yet, consistent with the intent to marginalize, minimize and suppress the Black vote. Few ,if any, former confederates were prosecuted for treason despite that there was sufficient probable cause to prosecute them for this crime, as was done in the case of Jefferson Davis and others.

In contrast, local prosecutors were not reticent in prosecuting citizens, especially Black men for criminal offenses, knowing full well that convictions were easy to obtain especially when Blacks were routinely excluded from grand and petite jury lists and even today, subjected to a so-called criminal justice system, which has a disparate and disproportionately negative impact,  few if any ex confederates were prosecuted, while those who allegedly committed felony offenses, many of whom were black, were prosecuted and disenfranchised. [9] This has and continues to constitute a  denial of equal protection based on race.[10]

---

[9] Recent statistics reveal that nearly half of all inmates in state or federal prisons and local jails are non-Hispanic Blacks. In terms of raw numbers, there are more than one million Blacks in prison or jail on any given day. These

In other words, Virginia has historically been guilty of selective prosecution based on race which fits within the ambit of El-Amin's claim of denial of equal protection.

Also, the inclusion of "paupers" as persons being unable to register and vote in the 1870 Constitution was also race-based. This is because the vast majority of those persons who likely would be classified as paupers and therefore subject to disenfranchisement would have been black because a vast majority of Blacks who were enslaved would have been recently freed by the 13th Amendment. Having been enslaved for most if not all of their lives would likely result in pauper status as compared to whites who were never enslaved.

Moreover, since the decision over whether one is or is not a pauper was made by a White voting officials, the likelihood that Blacks would be placed in this category is also strong, a fact that was clearly not lost on conservative White delegates to the 1869 Constitutional Convention particularly given their concern and determination to suppress the Black vote by "any means necessary". [11]

---

numbers are staggering, and unfortunately, they seem to be rising. Commentators have offered various compellingtheories explaining the disproportionate number of incarcerated Blacks, including the following: the "over-policing" of Black communities, the "war on drugs" (which unfairly targets minorities), prosecutorial bias, and other flaws and biases in the trial process that result in Blacks receiving harsher treatment than Whites and innocent minority defendants being convicted. These well-supported theories contradict the notion that Blacks are simply more prone to committing crimes. To the contrary,Blacks are more prone to being swept up in a criminal justice system that is, in manyrespects, hostile to and biased against them. A rule such as Rule 609, which almostensures convictions based simply on a defendant's prior record, is particularlydisturbing when one considers the plight of Blacks in the criminal justice system.
Once a Black person is convicted of a crime (a likely scenario given the current statistics), that conviction will help to convict him again if he is ever charged with another crime (another very likely outcome given the "repeat offender" statistics for Blacks). Rules such as Rule 609 keep Blacks ensnared in the criminal system, perpetuating the criminalization of a staggering percentage of the Black population. (Footnotes omitted)
 Carodine, Montrè D. (2009)"The Mis-Characterization of the Negro": A Race Critique of the Prior Conviction Impeachment Rule," Indiana Law Journal: Vol. 84: Iss. 2, Article 4.
http://www.repository.law.indiana.edu/ilj/vol84/iss2/4
[10]See also,  Horne Gerald. "When Race and Gender Collide: The Martinsville Seven Case as a Case, Study of the Rape-Lynch' Controversy." In Challenging Racism and Sexism: Alternatives to Genetic Explanations. Edited by Ethel Tobach and Betty Rosoff, 211-28. New York: Feminist Press at CUNY, 1994.
[11] For a more detailed discussion of Black voter suppression in 1869, see Arguments 8 and 9, infra.

8.    **The Facts Alleged In The Complaint Are Sufficient To Make Out A Case Of Suppression Of The Black Vote Post Reconstruction**

Defendants argue with regard to the intent of the Constitutional Convention of 1901-02, "[t]here is no plausible allegation of fact that could properly impute the intent of the Constitutional Convention of 1901-02 to the Constitution of 1970 even if we knew for a certainty exactly what Carter Glass was saying and for whom he was speaking." (Defendant's Memorandum, p. 25.) Defendants further argue that "El-Amin offers no facts demonstrating who Glass' was speaking for, other than himself...[that] Glass's comment in the Complaint appears to be a paraphrase of what he may have said. It is not a direct quote, it is not dated, and no context for the statement is provided." Id. at p. 26

Defendants also state, "the fact that the final revision of the Virginia Constitution took place in 1970 breaks the alleged chain of historical causation." Id.

The response to Defendants' contention regarding the statement attributed to Glass has two facets.  First, according to defendants, since it was paraphrased and not a direct quote, they claim that the statement has no probative value even in this motion to dismiss proceeding.

This argument lacks any legal merit because the statement must be considered true for the purposes of the motion to dismiss and it is not implausible to contend that the statement manifests the racial disposition of Glass and supports the contention that there would those who t attended the Convention who were "motivated by a desire to discriminate against blacks on account of race." *Hunter v. Underwood, supra.*

The second facet to the argument, responds to defendants' contention "that it is not known what Glass meant by this comment."  At this stage in the proceeding, El-Amin contends that Glass' comments evince and manifest a negative racial animus with regard to African

13

Americans.[12] Indeed, there could be no other reasonable inference from his statement which is

inconsistent with a racial animus. If the words attributed to Glass in the Complaint create doubt

as to his intentions consider a speech Glass made on September 5.1901 at the Constitutional

Convention which he entitled, "A CONCLUSIVE ARGUMENT SHOWING WHY WE

SHOULD SUBMIT THE NEW CONSTITUTION TO THE WHITE ELECTORATE." (Exhibit

2)

As the title suggests, Glass advocated to the members of the Constitutional Convention in

1901 that the new Constitution that would come out of the Convention should only be submitted

to white voters. An excerpt from the speech, Glass' closing remarks should remove any doubts

about his position and feelings towards Blacks:

> I make no protestations as to my feeling for the Virginia negro. It
> has been long since demonstrated that in matters most nearly
> related to his material and civil welfare the white race of the
> Commonwealth is very best friend. I find little fault and pass no
> censure upon him for his misguided causes in the politics of the
> State. His conduct in this regard is as much preferable to those who
> misguided him as it is an evidence of his own incapacity to
> exercise the right of franchise; but I confess my amazement that it
> should have been proclaimed upon this floor the other day that the
> white people of Virginia are the beneficiaries of the negro
> toleration, and that but for this characteristic of the negro,
> exercised in our behalf at the period of reconstruction we would
> not be permitted today to sit in this hall for the purposes of passing
> upon his right of suffrage.
> There were twenty-four negroes in the Underwood Convention,
> and when Hine moved that, in adition (sic) to those who had
> already been disenfranchised, all persons who had held any
> position in the Army ranking above first lieutenant should be
> excluded from the right of voting, twenty-two of the twenty-four
> negroes joined with ten Northern man in voting for the proposition.
> When, again the same Mr. Hine proposed to disenfranchise all
> original secessionists, the same twenty-two negroes voted for that

---

[12] See also, "Civil Death": The Ideological Paradox of Criminal Disenfranchisement Law in the United States, p. 1088 n. 190, by Alec C. Ewald, Wisconsin Law Review, 2002:1045 (Exhibit 8)

infamous proposition. When the disenfranchising clause proposed separately was submitted to a vote of the people, 84,410 votes were cast for it as already stated by the gentleman from Culpeper. When the ironclad oath was by direction of General Grant, submitted separately to the people, 83,458 negro votes were cast for it.

No, no; let me say to the delegate from Frederick, we are not here by the sufferance of the Virginia negroes. We are here in the mercy of God, by virtue of the fact that writ in the faces of those men who sit about me is the Divine imprimatur of that intellectual superiority and racial supremacy to which was committed the Ark of the Covenant, and which today holds sway and dominion over this earth. (Applause.) It is by reason of that intellectual superiority that we claim the right of government, and is by virtue of that racial supremacy that we intend to have right of government. (Applause.)

(Exhibit 2, pp. 7-8.)

Defendants' also argue in their brief that the 1970 Virginia Constitution " breaks the alleged chain of historical causation" . Defs Memorandun, p. 26.  This argument is clearly contrary to the holding in Hunter *v. Underwood*, **471 U.S. 222 (1985),** where the Court emphasized the point that where the original enactment was motivated by a desire to discriminate against Blacks on account of race, "the action continues to this day to have that effect. As such, it violates equal protection under Arlington Heights." 471 U.S. at 233.  Accordingly, there is no break in "the chain of causation" suggested by defendants.

The Voting Rights Act, which was enacted in 1965, "singled out will cause in which Southern states with a history of racial segregation and discrimination in the election process." Virginia was and still remains under the supervision of the Voting Rights Act. [13]

---

[13] "Virginia and the Voting Rights Act, Thomas R. Morris, The University of Virginia News Letter, June 1990. (Exhibit 6)

15

This Court can take judicial notice that Virginia, having been placed under the

supervision of the Voting Rights Act, and is still under the supervision of the Act, is evidence of

its racist and discriminatory past with regard to Blacks in the electoral process.

9.  **Because The Adoption Of The Disenfranchising Provisions In Virginia's Constitution Were The Products Of Constitutional Conventions In 1869 And 1901 In Which The Disenfranchising Of Blacks Were The Dominant Issues, The Holding In *Hunter v .Underwood*, *Supra,* Is Applicable To This Case.**

A description of the Constitutional Convention of 1868 can be found in Chapter VI of

Eckenrode's Johns Hopkins Studies, (Exhibit 5) to wit:

> This convention was the most remarkable assembly that ever met in Virginia. It was the first legislative body in the history of the state in which negroes set as members. For this reason and on account of that bitter political feeling of the time, the session of the convention was exceedingly inharmonious. The membership of the body indicates the great political revolution that had taken place in Virginia with the extension of the ballot to the colored race. The old, long-dominant planter class which had governed the State through its previous history, was now without power; the organic law was to be framed by negroes and the white representatives of negroes and of the whites who supported the Republican party in defiance of their race.

pp. 87-88

The author went on to discuss the workings of the Convention and made this observation:

> The convention grew more turbulent as the session wore on. Especially was this the case when the question of suffrage was brought up for its final settlement. It now occupied the attention of the convention for the greater part of the remainder of the term. The meetings were sometimes very stormy, and members came almost to blows. The temper of the conservator press rule more and more denunciatory, as it became increasingly evident that the radical members intended to embody sweeping measures of the disenfranchisement in the constitution.

Id. at p. 97.

16

The author wrote in a footnote,

> The Richmond Enquirer said on February 12: 'will the patience of
> the Northern people allow this monstrosity much longer? It is not
> merely an absurdity. It is not merely disgust. It is a terror. It is that
> most diabolical of plots of dramas – a frightful tragedy in the garb
> of a farce... It gives to republican forms their deadliest below by
> making them supremely contemptible.

p. 97 n. 30

The author described the various provisions for disenfranchising confederates and the
concerns that some of the disenfranchising measures "were too sweeping, as the new amendment
would probably have disenfranchised several thousand more men." Id. at p. 99

Again, in a footnote, the author quoted the Richmond newspaper, which stated,

"'The Negroes and the New England squatters in the capital have at last wasted the black
flag. There is no longer the slightest attempt upon their part to disguise the fact that the
proscription and pillage of the white race are their object.' – Enquirer, March 9, 1868."Id. n. 37

In spite of all of the wrangling and turmoil surrounding the Convention, the author made
the following observations with regard to the outcome of the Convention:

> The Underwood Constitution contained the great measures of the
> Virginia Reconstruction policy, but not the extreme radical views.
> Civil equality was guaranteed alike to whites and blacks, and all
> men, without distinction of color, might vote, hold office and sit on
> juries, provided they were sane and had not committed certain
> offenses. Idiots, felons and duelists were disenfranchised; likewise
> 'every person who has been a Senator or Representative in
> Congress, or elector of President or Vice-President, or who held
> any office, civil or military, under the United States, or under any
> State, who having previously taken an oath as a member of
> Congress, or as an officer of the United States, or as a member of
> any State Legislature, or as an executive or judicial officer of any
> State, shall have engaged in insurrection or rebellion against the
> same, or given aid or comfort to the enemies thereof. The
> Legislature, by a three-fifths vote of both houses, might remove the

17

> disabilities of this clause. Furthermore, all persons before entering
> upon office were required to take the 'test-oath,' to the effect that
> the subscriber had not voluntarily aided the Confederacy or held
> office under it. It will be seen that these were the disenfranchising
> measures of the Federal government.

Id. at pp. 101-102

The Convention's approval of the "Underwood" or "Negro" Constitution drew the

following description:

> The Constitution in other main features did not meet with the
> approval of the Conservative people. Indeed they generally
> condemned it, on the ground that no fundamental law could be
> acceptable which excluded the majority of the leading men in the
> State from political rights. The evident hostility of the white people
> to the Constitution prevented its immediate submission to the
> popular vote for ratification. The Republican leaders paused in
> uncertainty, studying the political conditions in hopes of a
> favorable chance of acceptance. But none came for more than a
> year, and Virginia continued to live under military rule, which was
> more palatable to the people then the new Constitution. The
> election upon it was finally held the next year, with the
> disenfranchising clauses offered for rejection or acceptance apart
> from the main body. The Constitution was adopted and the
> disenfranchising articles rejected, and Virginia resumed her federal
> relations. Thus shorn of prospective features, the constitution
> proved to be a pretty good one, in spite of the fact that 'carpet-
> baggers' had assisted in making it. The Underwood Constitution
> continued to be the organic law of the state from 1869 until 1902,
> when the present Constitution was framed.

Id. at pp. 102-103.

The following description of the 1868 Constitutional Convention makes out a case that is

consistent with the holding in *Hunter* that the dominant issues in the convention involved Black

suffrage and steps taken to assure that Blacks would not take over the State politically as a result

of the disenfranchisement of Confederates as required by §§2 and 3 of the 14th Amendment:

18

> The reconstruction of Virginia had come to an end and after well-nigh five years of weary waiting. Nearly nine years had passed since the State had withdrawn her representation from the Federal Congress. After this long period war and political subjection the white people of Virginia had regained control of its affairs. The reconstruction had for its ultimate purposes proven a failure. For it was the desire of Congress and the name of the radical politicians in Virginia to place the two races on an equality of rights and privileges – to abolish the belief of the white man in the essential inferiority of the black. They thought that a democracy should no more recognize racial distinctions than real class distinctions and so they had endeavored with motives high and low to break down the separation of the races. It was impossible that any such attempt should succeed. But reason was lost in the humanitarian enthusiasm of the times. Men had such faith in the power of literary education that they thought it could raise, in a day, the black folk to the level of the white. The radicals indeed gained the privilege of suffrage for the freedmen, but it remained purely isolated. The negro might not hold office, serve on juries and exercise the other political functions of citizens. There were no actual prohibition of these things to the colored people, but a general agreement existed among the conservative whites that they should not enjoy them. And the white men have used all the devices of politics to prevent the local supremacy of the blacks and portions of the State where they held the majority.

Id. at p. 127

The author of the John Hopkins' treatise described the problem of Black suffrage during the ensuing period as follows:

> The recognition of Negro suffrage, wrung from the reluctant white people, never grew into a belief in the wisdom and justice of that measure. Indeed a desire arose in the State to debar the negro as far as possible, from exercising his privilege of voting. The result is to be seen in the Constitution of 1902 under which the great majority of blacks had been disenfranchised through the educational and property qualifications which now hedge about the ballot in Virginia.

Id. at p. 128

19

In American Constitutional and Legal History, *The Virginia Constitutional Convention of 1901-1902*, (Da Capo Press, New York, 1972), its author, Ralph Clipman McDanel, discussed the period between the Underwood Constitution and the 1902 Virginia Constitution in his introduction as follows:

> At the election on July 6, 1869, the constitution was adopted... As a result of the defeat of the most obnoxious features of the constitution and the preponderance of white voters, the Conservative party came into power and Virginia was spared the horrors and excesses of reconstruction which were visited on some of her less fortunate sisters. The negro vote was, however, a powerful factor in the political life of the State, and with the idea of eliminating it to a certain extent the constitution was amended in 1876 to require the payment of a poll tax before voting and the addition of petit larceny as a disqualifying crime. These two provisions were aimed directly at the negro for it was thought that many would fail to pay the tax, and petit larceny was a common offense among them. Because the poll tax requirement for voting became the source of much fraud and corruption by the buying of votes the constitution was again amended in 1882 to do away with this feature of the law. It had been unpopular with both negroes and whites and had failed signally (sic) to accomplish its purpose. After this unsuccessful venture the disfranchisement of the negro was undertaken by more stringent election laws.

p. 6 (Exhibit 3)

In describing the suppression of the Black vote beginning in 1880, the author states:

> The most popular method in voting precincts where the negro was in the majority was to have the voters approach the ballot box in two lines, white and colored. Although the votes were received alternately from each line, the fact that the colored line was much longer and that much time was consumed in finding the names of the colored voters on the registration books kept many negroes from voting so that when the polls closed a line of negroes would frequently be standing before the voting place waiting to cast their ballots. According to testimony given before Congressional committees, it was not unusual for some negroes to occupy a place in line on the night before election day in order to be assured arrangements were undoubtedly made, in many cases, for the express purpose of cutting down the negro vote there was

20

> frequently a real difficulty in ascertaining the identity of the
> negroes because of the fact that many bore similar names. At one
> time in Richmond ninety names appeared five hundred
> times on the disfranchised lists, or more than five times each on
> an average. These disfranchised lists were another legitimate
> source of delay in the negro vote. There were lists of those who
> were disfranchised for the commission of crime and among the
> negroes, were always long. It was necessary to look through these
> lists before accepting a ballot offered by a negro. Another
> difficulty with the negroes was due to the fact that they moved so
> frequently that unless challenged it was easy for them to vote in
> precincts in which they did not live.

Id. at pp. 26-27.

The author described the sentiment of Virginia's whites going into the 20th Century in

the following manner:

> That many otherwise honest, copyright and respectable men
> believed the end of Negro disenfranchisement justified the means
> used to obtain it cannot be doubted. They felt that they were
> confronted by a condition and not a theory, and that that the texture
> and of all the day held dear and the enjoyment of "life, liberty and
> the pursuit of happiness" demanded that the Negro be relegated to
> a subordinate position in politics commensurate with that which he
> occupied in the social and economic life of the State.

Id. at p. 33

The author quoted from the Richmond Dispatch April 7, 1900 which wrote, "It is more

courageous and honorable and better for public morals and good government to come out boldly

and disenfranchise the negro than a pretense of letting him vote then cheating him at the polls."

Id.

In framing the suffrage article in the new Constitution, the 1901 convention was "called

upon to disenfranchise, under the Constitution of the United States, 146,122 Black males over 21

years of age without, at the same time, disenfranchising any of the 301,379 white males." Id. at

p. 34

21

Therefore, the question before the majority of whites at the convention was "one of method" in disenfranchising Black voters, with a "great majority of the convention... willing to see all negroes disenfranchised, if that could be done..." Id. at p. 36

Although there were divergent views of how to achieve this, there was unanimity on some of the particulars of gaining suffrage in Virginia. For example, two years residency in the state, one-year in the County or city and 30 days in the precinct. There was also the requirement that the poll tax of $1.50 be paid at least six months prior to the election, with former soldiers excepted from this requirement. [14] Id. at p. 39

During the debates, Senator Glass contended that the payment of a poll tax and the literacy test would disenfranchise 80% of the Negroes, a position that was countered by some who argued that Blacks were learning how to read and write more rapidly than illiterate whites, thus the literacy tests would become less and less effective in disenfranchising Black voters. Id. at p. 41

There was also a discussion and support for the inclusion of an "understanding clause" which would be administered by white registrars who had the discretion as to who passed or failed this test. With this clause and other features, it was estimated that four-fifths of Black voters would be disenfranchised, without disenfranchising a single white voter. This was considered by a majority of white delegates as an acceptable result in that while disenfranchisement of Blacks would undoubtedly be discrimination within the letter of the law, it somehow was not in violation of the law. p. 44

---

[14] The soldier exception obviously provided for relief to white confederates and gave virtually no relief to blacks because the vast majority of them did not have any military service.

22

From the above discussions, debates and issues before the 1901 convention, it is clear that the disenfranchising of the Black vote was a major part and desired outcome of the 1901convention.

*Hunter* gives this Court the imprimatur to grant El-Amin the relief he requests in his complaint. In that case, the Court found that while there were "no 'eyewitnesses' to the Alabama Constitutional Convention of 1901, the Court found that the convention "was part of a movement that swept the post-Reconstruction South to disenfranchise Blacks." The Court also found that "delegates to the all-white convention were not secretive about their purpose" citing the opening address of the president of the convention that the aim was to establish white supremacy in Alabama. 471 U.S. at 229

El-Amin contends that when Virginia gave white confederates a pass and did not disenfranchise them, despite the requirement to do so by §§2 and 3 of the 14th Amendment, that this decision was racially motivated, to wit, to prevent Black voters becoming a majority in Virginia. This was the concern raised in Minority Report XXXVII previously referred to. (Exhibit 1)

It is precisely because of Virginia's disparate treatment of the two classes of persons identified in §§ 2 and 3, felons and confederates where felons were disenfranchised while confederates retained their right to vote that sustains El-Amin's equal protection claim. The Fourth Circuit case of *Williams v. Hansen*, 326 F.3d 569, 588 (4th Cir. 2003), provides legal support for this contention.

In that case, the Court held that pursuant to the Supreme Court's decision, *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), that a

23

facially neutral yet discriminatorily motivated administrative action violates equal protection. The Court went on to state that "given the unbroken and wide-ranging line of equal protection decisions reaffirming and applying the Arlington Heights principle, it is difficult to imagine how the message might have been made clearer." (citations omitted)

The Court in Williams also cited *Hunter*, stating that the disenfranchisement of persons convicted of crimes involving moral turpitude "was motivated by a desire to discriminate against African-Americans on account of race and ... continues to this day to have that effect".

In *Adams v. the Trustees of The Univ. of North Carolina–Wilmington*, 640 F.3d 550, 566 (4th Cir. 2011), the Court held that in order for a plaintiff to succeed in a denial of equal protection claim, he/she was "required to plead sufficient facts to 'demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination.'"

El-Amin contends that he has met this burden.

## 10. El-Amin Has Standing To Challenge Virginia's Scheme For Reinstatement And His Claims Are Ripe.

The argument of defendants that El-Amin lacks standing to challenge the reinstatement process in Virginia might have validity if El-Amin were not already eligible for reinstatement as required by Governor McDonnell's reinstatement policy.

El-Amin's challenge to the reinstatement process presents a real, substantial controversy between him and the defendants and his challenge presents a dispute which is definite and concrete, not hypothetical or abstract as set forth in *Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006)

El-Amin's challenge meets the paradigm set forth in *Benham v. City of Charlotte*, 635 F.3d 129, 134-135 (4th Cir. 2011) in that his disenfranchisement is without a doubt, an injury in fact. There is causal connection between his continued disenfranchisement which is connected or traceable to the procedures which the defendant Governor has set up for reinstatement of voting rights. Lastly, if the court agrees with El-Amin and finds fault with the procedure used by the Governor to consider reinstatement of his voting rights, and orders those faults to be either eliminated or corrected, then there is a likelihood that the reinstatement will be successful thus relieving El-Amin of his disenfranchisement.

The cases cited by the defendant with regard to standing are inapposite to the case at bar. In *Doe v. Va. Dep't a/State Police*, 2011 U.S. Dist. LEXIS 68939, (E.D. Va. June 27, 2011), the plaintiff sex offender was barred from certain properties evolving schools or day care centers with the proviso that she could obtain relief through a petition filed in the circuit court and notifying some other individuals. Rather than follow this procedure, she he filed a federal complaint.

The court found that she did not have standing because the other procedures which were available to her could have provided her with the relief she sought depending on how the circuit court and others reacted to her request to enter upon the property and that any standing that she might have would be in the future.

The distinction in the *Doe* and the instant case are fairly apparent. First, the Governor is the only "game in town" with regard to reinstatement of voting rights which is not the case in Doe. Moreover, Doe did not challenge her status as a sex offender but only the bar to her entry upon certain physical premises. In the instant case, El-Amin has made a full frontal attack on his

25

status as a disenfranchised person and he has challenging the lack of due process in the procedure instituted by the Governor for rights reinstatement.

If El-Amin is not successful in this lawsuit, and he wants his right to vote reinstated, he will have no choice but to petition the Governor. However, if the petitioning process is constitutionally flawed as he has argued, then this Court can resolve the flaws within the context of this lawsuit rather than having requiring him to wait until the decision is made with regard to his attack on his disenfranchisement.

Defendants also argue that the case is not ripe, for precisely the same reasons that they argue that El-Amin does not have standing. El-Amin responds to this argument by incorporating his response to the lack of standing issue.

Defendant's arguments of standing and ripeness are more akin to a claim of failure to exhaust other remedies which of course in not required in a §1983 action. *Felder v. Casey*, 487 U.S. 131, 147, 108 S.Ct. 2302, 2311, 101 L.Ed.2d 123 (1988); *Wilbur v. Harris*, 53 F.3d 542, 544 (2d Cir.1995) and *VanHarken v. City of Chicago*, 103 F.3d 1346, 1349 (7th Cir.1997).

**11.    Life Time Disenfranchisement Is A Violation Of The Eighth Amendment.**

Virginia's disenfranchisement law results in a lifetime ban or disqualification of a felon's right to vote save perhaps his/her success in having the Governor grant a petition for reinstatement. Reinstatement is not a sure thing because the Governor is given boundless discretion in granting or denying the petition and there is no right of appeal from his denial.

Accordingly, this lifetime disqualification violates the Eighth Amendment to the Constitution of the United States in two aspects.[15]

First, life-time disenfranchisement in light of the crime El-Amin was convicted does meet the proportional requirement as defined in *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983) and *U.S. v. Rhodes*, 779 F.2d 1019 (4th Cir. 1985).

Second, lifetime disenfranchisement violates the evolving standards concept found by courts in the Eighth Amendment. This standard was articulated in *Trop v. Dulles*, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) where the Court stated:

> The basic concept underlying the Eighth Amendment is nothing less than the dignity of man. While the State has the power to punish, the Amendment stands to assure that this power be exercised within the limits of civilized standards. Fines, imprisonment, and even execution may be imposed depending upon the enormity of the crime, but any technique outside the bounds of these traditional penalties is constitutionally suspect. This Court has had little occasion to give precise content to the Eighth Amendment, and, in an enlightened democracy such as ours, this is not surprising. But when the Court was confronted with a punishment of 12 years in irons at hard and painful labor imposed for the crime of falsifying public records, it did not hesitate to declare that the penalty was cruel in its excessiveness and unusual in its character. *Weems v. United States*, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793. The Court recognized in that case that the words of the Amendment are not precise,32 and that their scope is not static. The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society., requires us to undertake an extensive proportionality review of defendants' sentences in accordance with a three-part test announced by the Court.

---

[15] In Allen v. Ellisor, 664 F.2d 391, 396 (4th. Cir. 1980), the Court mentioned 10 New England Law Review 477 at 484-85 (1974), stating, "the author... advises that future challenges to these disenfranchisement statutes rest on...the Eighth Amendment prohibition against cruel and unusual punishment...".,

356 U.S. at 100-101.

The fact is that Virginia is in the distinct minority of states imposing lifetime disenfranchisement for the commission of a felony as evidenced by the following table in Exhibit  .

Virginia is one of only eight states that provide for automatic, indefinite disenfranchisement of first time felons.[16] Virginia is only one of four states disenfranchising over 100,000 ex-offenders as of 1998.[17] Virginia is only one of four states where t least one in four Black men are indefinitely disenfranchised.[18]

**12.   Because The Restoration Procedure In Virginia Is The Only Method To Avoid A Lifetime Disenfranchisement, The Unfettered And Boundless Discretion Given To The Governor In The Restoration Process Violates Both Substantive And Procedural Due Process.**

Courts have always looked askance at situations where officials are given "unbridled discretion" in their executive functions.  This is particularly true in First Amendment speech situations.  See e.g., *Victory Through Jesus Sports Ministry Found. v. Lee's Summit R–7 Sch. Dist.*, 640 F.3d 329, 267 Ed. Law Rep. 466 (8th Cir., 2011) where the Court, citing *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988), held that "the grant of unbridled discretion in a licensing statute is suspect because it 'constitutes a prior restraint and may result in censorship.'"  640 F.3d at 337.  *See also, Child Evang. Fellowship, Md. v. Montgomery Schools*, 457 F.3d 376 (4th Cir., 2006) where the Court found that an organization limited access to certain purportedly neutral speakers but actually

---

[16] Ewald, Alec, 'Civil Death': The Ideological Paradox of Criminal Disenfranchisement Law in the United States (March 24, 2012). Wisconsin Law Review, p. 1054, n. 23
[17] Id. at p. 1055, n. 25
[18] Id. at p. 1086, n. 186

reserve to itself unbridled discretion to permit or deny access to any speaker for any reason it chooses.

Courts were also critical of unbridled discretion in other decisional contexts such as, prosecutorial discretion, *Crawford v. Bounds*, 395 F.2d 297 (4th Cir. 1968) and *Griffin v. Warden, West Virginia State Penitentiary*, 517 F.2d 756 (4th Cir. 1975); and in licensing and regulation of adult bookstores, *Chesapeake B & M, Inc. v. Harford County*, Md., 58 F.3d 1005 (4th Cir., 1995).

The defendant Governor in this case does not provide any contours on the exercise of his power to reinstate the voting rights of felons. Under the circumstances, he is free to deny a petition for any reason and is not required to articulate the reasons. In its current iteration, the reinstatement process provides no transparency or other restraints on the Governor's authority and discretion with regard to this important activity.

Accordingly, the reinstatement process is absent any due process considerations procedural or substantive.

## 13.    Reinstatement In Virginia Is Capricious And Arbitrary.

In addition to be shorn of due process, the reinstatement procedure in Virginia is also capricious and arbitrary. The mandatory time frames for which a felon must wait until eligible to apply for reinstatement are capricious and arbitrary. In El-Amin's case, he was not able to register, vote, and hold public office for a period of slightly more than eight years, to wit from the date of his plea of guilty, July 1, 2003, until the date that he was two years beyond his release from probation, August 8, 2011.

Neither the disenfranchisement law nor the reinstatement process explain or attempt to justify the eight-year waiting period in El-Amin's case.

The problem is there is no rational basis for the waiting periods other than that was what was in the Governor's head when these waiting periods were developed. While § 2 of the 14th amendment gives states the right to disenfranchise voters for criminal activity, there is nothing in the legislative record or in the debates involving §2 that suggest that an appropriate waiting period is authorized or even recommended. Thus, the Governor is given the unbridled discretion to set up waiting periods.

It is arguable and the defendants cannot refute that the waiting periods before one is eligible for reinstatement in Virginia are a subterfuge for voter suppression. Why for example is there a waiting period after a person is released from prison; or, after completion of probation? Yet, the prospective applicant must wait an additional period after he/she completes probation to be eligible for reinstatement. Moreover, being eligible for reinstatement does not mean that reinstatement is a foregone conclusion.

Another aspect of the capricious and arbitrary nature of the restoration process can be seen in the way in which the Governor reports his pardons, commutations, reprieves and restoration of rights decisions.

For example, in 2009, Governor Kaine issued his report on these results in a 385-page report. (Exhibit 4)[19]

---

[19] Because of the page volume of this report, only thirty (30) pages of the report will be attached as an exhibit to this memorandum. The entire report can be found at the following web address:
http://leg2.state.va.us/dls/h&sdocs.nsf/fc86c2b17a1cf388852570f9006f1299/09d554c243ae3e69852574060056c676/$FILE/SD2.pdf

Notably, Governor Kaine gave a written explanation for his reasons for pardons, commutations and reprieves which can be seen from page 1 through 27 in that report. However, his report of reinstatements only provides the name of the person whose rights were restored; the court in which the conviction was entered; the offense; the sentence date; the date that the obligations were satisfied; and, the date that the rights were restored.

Conspicuously absent from this report: the reason or reasons that the rights were restored; the name and other information of persons who applied but whose rights were not restored; and the reasons that their rights were not restored. This lack of transparency, absence of information; and absence of reasons supports the contention that the process is capricious and arbitrary.

With regard to the issue of attorney's fees, El-Amin reserves the right to wait until the conclusion of the case before making a decision as to whether to apply for attorneys fees. Notwithstanding the argument of the defendants, El-Amin does not concede this issue, but defers a response until the conclusion of the case.

## CONCLUSION

For the reasons stated herein, El-Amin argues that this is a case where the history cited is settled, accurate and authentic, especially with respect to the intent, design and execution of various and sundry devices to disenfranchise and suppress the Black vote following the end of the Civil War. This effort unfortunately continues with several states including Virginia instituting voter identification laws. Federal appeals courts in Texas and Ohio have struck down these laws finding that they discriminate against the poor and minorities.

Because there are no genuine issues of fact in dispute which would negate Virginia's shameful record with regard to its treatment of people of African descent by implementing

31

various tricks, artifice and even state-sponsored terrorism to prevent, delay and derail the constitutional rights of Black people's right to vote and hold office.

Historically, Virginia has prevailed in these attempts, and without excuse or legal justification, the State was able to depress, suppress, and disenfranchise the Black vote using every possible means at their disposal.

History shows that Virginia successfully avoided the law of the land which if fairly and constitutionally implemented, would have given the Black vote the upper hand following the 1870 Constitution because the vast majority of whites who were engaged in rebellion against the Union were supposed to have been disenfranchised and thus ineligible to vote on both the new Constitution in 1870 and local and state and federal elections through 1872, when Congress passed the General Amnesty Act.

Despite its wrongdoings and its illegal conduct, Virginia disenfranchises for life exfelons. Because of its historical misconduct as described herein, Virginia does not come into this Court with clean hands.

For the reasons set forth above, El-Amin respectfully requests that the Court deny Defendants' motion to dismiss on all of the claims set forth in the Complaint.

Respectfully submitted,

SA'AD EL-AMIN

Sa'ad El-Amin, pro se
24 Overbrook Road
Richmond, VA 23222
804-439-8515
saadelamin@aol.com

32

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of September 2012, I hand delivered the foregoing with the Clerk of Court and emailed a copy to George W. Chabalewski, Esquire, Senior Assistant Attorney General, Attorney for the Commonwealth of Virginia, Governor McDonnell and Secretary of State Kelly to, Office of the Attorney General, 900 East Main Street Richmond, Virginia 23219 gchabalewski@oag.state.va.us; and, to William W. Tunner, Esquire, *Thompson*McMullan, 100 Shockoe Slip, Richmond, VA 23219, wtunner@t-mlaw.com.